David McCLARY, Plaintiff,

v.

Thomas A. COUGHLIN, III, et al., Defendants.

No. 90–CV–0501A.

United States District Court, W.D. New York.

March 14, 2000.

Anna Marie Richmond, Buffalo, NY, for David McClary, plaintiff.

Emil J. Bove, Office of New York State, Attorney General, Rochester, NY, for Walter R. Kelly, Albert Hall, Philip Coombe, Acting Commissioner, Department of Correctional Services, Frank E. Irvin, Superintendent of Wende Correctional Facility, Ricky Branning, Deputy Superintendent for Security, defendants.

### DECISION AND ORDER

FELDMAN, United States Magistrate Judge.

#### Introduction

On February 23, 1999, after a two week trial, the jury returned a verdict finding liability and awarding damages against four of the defendants in the above captioned case. Specifically, defendant Hall was found liable in the amount of $10,000 to plaintiff and defendants Irvin, Branning and Coughlin were found liable in the amount of $650,000 to plaintiff. Presently before the Court are motions filed by the liable defendants seeking judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) or, in the alternative, a new trial pursuant to Fed.R.Civ.P. 59. (Docket 112, 113).[1] For the reasons that follow, defendants' motion for judgment as a matter of

law is denied. Defendants' motion for a new trial is **granted in part.**

#### Standard of Review and Relevant Factual Background

■ In ruling on defendants' Rule 50(b) motion for judgment as a matter of law (JMOL), this Court "is required to deny the motion unless, viewed in the light most favorable to the nonmoving party, the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Sir Speedy, Inc. v. L & P Graphics, Inc.,* 957 F.2d 1033, 1038–39 (2d Cir.1992) (internal citations and quotations omitted). *See Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 60 (2d Cir.1993) (because the trial judge cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses or substitute its judgment for that of the jury, nonmoving party must be given the benefit of all reasonable inferences in Rule 50(b) motion determinations). With this legal standard firmly in mind, for purposes of defendants' motion for judgment as a matter of law, the facts viewed in the light most favorable to the plaintiff can be briefly summarized as follows.

The verdict in this case was the culmination of protracted litigation between plaintiff and employees of the New York State Department of Correctional Services ("DOCS") extending over the course of almost a decade. On June 28, 1989, plaintiff, David McClary ("McClary") was sentenced to a term of imprisonment of 25 years to life after being found guilty by a jury of the crimes of murder in the second

1. The substantial delay between the filing of post-trial motions and this Decision and Order is primarily due to a change in plaintiff's counsel. After post-trial motions were filed, plaintiff's trial counsel, Garry King, Esq., terminated his employment with the Western New York Law Center and an issue arose as to who would be representing McClary. Eventually, this issue was resolved and Anna Marie Richmond, Esq., assumed representation of plaintiff. In the fall of 1999, and without objection, Ms. Richmond submitted supplemental papers solely on the qualified immunity issue (Docket # 123) and the defendants' responded (Docket # 124). Oral argument on the defendants' post-trial motions was heard by this Court on November 15, 1999.

degree and criminal possession of a weapon in the second degree. The victim of McClary's crime was New York City Police Officer Edward Byrne. While McClary was the so-called "triggerman" in the murder of Officer Byrne, Howard "Pappy" Mason, an alleged New York City drug "kingpin," was separately charged in a federal prosecution with ordering McClary to "hit" Officer Byrne. The brutal and senseless murder of Officer Byrne and McClary's subsequent trial and conviction garnered substantial media attention at the time, particularly in the New York City area.

After sentencing, McClary was initially assigned to the Downstate Correctional Facility, but was soon transferred to Attica Correctional Facility ("Attica"). McClary arrived at Attica on July 11, 1989, and after administrative processing, was placed in the prison's general population. McClary was assigned the job of porter and was responsible for assisting in the maintenance of the building which housed the prison's school.

Although Attica is a maximum security facility, the disparities between a general population inmate and an inmate housed in the Special Housing Unit ("SHU"), the most restrictive and punitive prison housing classification used within DOCS, were described at length during the trial. While those differences will not be repeated in detail herein,[2] it is important to note that inmates assigned to a prison's general population openly interact with other general population inmates for a substantial portion of each day, including not only meals but also a variety of recreational, educational, vocational and religious activities. During the period of time

McClary was at Attica, the prison housed over 2000 inmates, the vast majority of whom were in the prison's general population. It was undisputed at trial that during the time when McClary was part of Attica's general population, he never presented any disciplinary or security problems to prison officials.

On September 29, 1989, McClary was removed from Attica and transported to the Metropolitan Correctional Center ("MCC"), a federal detention center in New York City. According to McClary, he had no advance notice of the move or the reasons he was being placed into federal custody. On September 30, 1989, the day after McClary was removed from Attica, defendant Albert Hall, then the Deputy Superintendent of Security at Attica, received a written memorandum from a Lieutenant Malenski. (Trial Exhibit 1A). The Malenski memorandum informed Hall that Glenn Goord, the Deputy Commissioner of DOCS, had ordered that McClary be placed into administrative segregation when he returned to Attica from "court." The memorandum described McClary as the "triggerman" who "assassinated a New York City Police Officer" and was "tied in with the New York City drug trade." The memorandum referred to a "major arrest involving some family members that has resulted in inmate McClary and some other inmates volunteering to testify in court against other drug dealers."

McClary testified that after he arrived at MCC, a man who identified himself as being from "the Justice Department" came to see him. According to McClary, the man asked him to cooperate and testify at the approaching federal trial of Howard "Pappy" Mason.[3] McClary testified he re-

---

**2.** The differences between living conditions experienced by McClary in SHU as compared to general population were also the subject of "extensive evidence" and "extensive findings of fact," *Kalwasinski v. Morse*, 201 F.3d 103, 106 (2d Cir.1999), in a liberty interest hearing conducted by this Court pursuant to *Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). *McClary v. Kelly*, 4

F.Supp.2d 195 (W.D.N.Y.1998). Those differences, as described in this Court's earlier opinion, resulted in a finding that the hardships endured by McClary in SHU were atypical and significant in relation to the ordinary incidents of prison life. *Id.* The defendants did not appeal this Court's *Sandin* decision.

**3.** *See United States v. Nichols*, 56 F.3d 403 (2d Cir.1995).

fused to assist in the Mason case. McClary's testimony regarding his conversation with the man from the "Justice Department" was disputed by the defendants. Mason's attorney, Harry Batchelder, Esq., testified that in the fall of 1989 *he* asked federal prosecutors to bring McClary to MCC so that he could ascertain whether McClary would be a useful *defense* witness. After briefly meeting with McClary at MCC, Batchelder decided not to use him as a witness. Although McClary never testified at Mason's trial, he remained in federal custody at MCC for two months.

On November 29, 1989, McClary was finally returned to Attica. He was not, however, returned to the prison's general population. Instead, McClary was immediately placed in administrative segregation in Attica's SHU, where he was confined to his cell alone for twenty-three hours per day, the only exception being a single hour when McClary was permitted outside to engage in solitary exercise in an SHU cage, or pen. For the next four years, three months and 19 days, and while confined in three different prisons, McClary remained in solitary confinement. In March 1994, almost four years after he commenced the present lawsuit, McClary was released from the SHU.

Much of the trial focused on the reasons for McClary's long-term assignment to SHU. Unlike most inmates confined in SHU, McClary's solitary confinement was not in response to any prison disciplinary infraction or punishment, but was classified as "Administrative Segregation." The jury heard testimony regarding New York State regulations which permitted administrative segregation only upon "a determination by the facility that the inmate's presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b). The relevant regulations, which were admitted in evidence, set forth the mandatory due process rights inmates have with respect to being placed and maintained in administrative segregation.[4]

Defendant Hall testified that until the Goord memo arrived in September 1989, he had never heard of David McClary or the circumstances of his crime. (Trial Transcript, Volume II, at page 513–514). However, upon his return to Attica, McClary was served with a DOCS notice officially advising him of the basis for his recommended placement in administrative segregation. The notice, dated November 20, 1989, read: "Due to the inmates (sic) notoriety/crime his presence in general population would pose a threat to the safety/security of the facility at this time." (Trial Exhibit 3). At the conclusion of McClary's initial hearing at Attica, the hearing officer confirmed the administrative segregation recommendation and informed McClary that he would "pose a danger to the facility and your presence in general population would adversely effect the facility by your influence on other inmates in general population." (Trial Exhibit 2).

Over the next six months, McClary's status in administrative segregation was reviewed pursuant to DOCS regulations by the Attica administrative segregation review committee ("ASRC") on at least twenty occasions. After each committee meeting, a recommendation form was signed by the committee members and forwarded to the superintendent for ap-

---

**4.** The regulations provide that the inmate is entitled to a due process hearing which "shall be conducted within 14 days of an inmate's admission to administrative segregation." 7 N.Y.C.R.R. § 301.4(a). The hearing decision must "set forth specific reasons why administrative segregation is warranted." *Id.* The regulations further provide that "[i]nmates assigned to administrative segregation status shall have such status reviewed every seven days for the first two months, and every 30 days thereafter by a three member committee, consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff." 7 N.Y.C.R.R. § 301.4(d). The committee's recommendation on continued confinement of the inmate in administrative segregation is then "forwarded, in writing, to the superintendent for final determination." *Id.*

proval. The forms were introduced in evidence at trial and each repeated the same language: "Due to the notoriety of his crime, his presence in general population would pose a threat to the safety and security of this facility." (Trial Exhibit 4). Some of the forms appeared to have been backdated, that is, the memorandum to Superintendent Kelly informing him of the committee's recommendation was dated *before* the committee even met. (*See, e.g.,* Memorandum to Kelly dated April 9, 1990 reflecting results of committee meeting of April 10, 1990; Memorandum to Kelly dated April 30, 1990 reflecting results of committee meeting of May 1, 1990).

On July 31, 1990, McClary was transferred to the Southport Correctional Facility ("Southport"). Again, he was immediately placed in administrative segregation and afforded an initial due process hearing. At the conclusion of the hearing, the hearing officer informed McClary that "due to the notoriety of your crime that your presence in population would create a threat to the safety and security of this facility." (Trial Exhibit 5). McClary remained at Southport until March 19, 1991. During that time and pursuant to DOCS regulations, the Southport ASRC met sixteen times. After each meeting, the committee issued the following recommendation to Southport's Superintendent: "Continue Administrative Segregation. Recommend Transfer." (Trial Exhibit 7). A member of the ASRC during the time McClary was confined at Southport testified that the committee recommended transfer so that McClary could be placed in general population.[5] (Trial Transcript Vol. III at page 1323). McClary remained in administrative segregation at Southport until he was transferred to the Wende Correctional Facility ("Wende").

McClary arrived at Wende on March 19, 1991, and again was immediately placed in administrative segregation. At the conclusion of his initial due process hearing, the Hearing Officer ruled: "It is felt that this inmate's presence in general population poses a threat to the safety and security of this facility due to the notoriety of the crime for which inmate was convicted." (Trial Exhibit 8).

McClary remained at Wende for almost three years. He spent the entire time in solitary confinement in Wende's administrative segregation unit. Paul Mecca, McClary's correction counselor during the time McClary was at Wende, testified that on three separate occasions during McClary's first eight months at Wende, he recommended that McClary be transferred to a facility where he could be placed in general population and be able to participate in prison programming. (Trial Transcript, Volume III at pages 1396–1400). Each request was denied. Mecca testified that he could recall no other inmate who spent four years in administrative segregation. (Trial Transcript, Volume III at page 1416).

During the three year period McClary was confined at Wende, the need for his continued administrative segregation status was reviewed by the Wende ASRC. Defendant Branning, the Deputy Superintendent for Security at Wende, was the Chairperson of the Wende ASRC. Branning testified that McClary's administrative segregation status was reviewed every seven days for the entire time McClary was at Wende. (Trial Transcript, Volume III at page 1349). Defendant Irvin, the Superintendent of Wende, testified that after McClary had been in administrative segregation for 60 days, he reviewed McClary's status on a monthly basis. (Trial Transcript, Volume III, at pages 1379–1381). The Wende ASRC review forms,

---

**5.** DOCS Directive 4933 (Trial Exhibit 403) concerned, *inter alia,* the transfer of administrative segregation inmates. The Directive provided: "When deemed appropriate, the in- mate will be evaluated and recommended for transfer to a facility where it is determined that the inmate may be programmed into general population." *Id.* at III(C)(5).

signed by both Branning and Irvin, however, profess weekly reviews of McClary's status. (Trial Exhibit 10). On March 12, 1994, McClary was transferred to the Shawangunk Correctional Facility and placed in the prison's general population.

Trial testimony also focused on the effect that administrative segregation had on McClary. For the entire period McClary was designated for administrative segregation, he was housed in SHU. Trial testimony confirmed that SHU is the most restrictive and punitive form of housing used by DOCS and that the SHU environment varies little from prison to prison. The vast majority of inmates who are in SHU are placed there for defined time periods as part of prison punishment. However, testimony also indicated that SHU houses a high percentage of actively mentally-ill inmates. (Trial Transcript, Volume II at page 692).

Because it is primarily a punitive housing environment, inmates residing in SHU are by regulation and practice given few options in their daily lives. Twenty-three hours a day are spent in their cells. All meals are eaten alone in their cells. SHU inmates are permitted one hour outside to exercise alone in a fenced cage or pen. SHU inmates are not allowed to use a telephone unless it is an emergency. Visitation, mail, personal property, clothing, educational, religious and recreational programming are all severely restricted for SHU inmates. The differences between SHU housing and general population housing in a maximum security prison were extensively discussed in this Court's prior *Sandin* decision, *McClary v. Kelly*, 4 F.Supp.2d 195, 203–06 (W.D.N.Y.1998), and the trial testimony was fully consistent with those factual findings. Despite the fact that McClary was not assigned to SHU for disciplinary reasons, the conditions of his SHU confinement were identical to inmates housed in SHU as part of a prison disciplinary sentence meted out for punitive purposes.

The effects of prolonged isolation in SHU were described at length during the trial testimony of Dr. Stuart Grassian. (Trial Transcript, Volume II at pages 675–774). Grassian, a board certified psychiatrist and faculty member at the Harvard Medical School, had conducted research and published articles on the topic of "psychiatric effects of solitary confinement" and was familiar with SHU housing in New York State prisons. Grassian, who also testified at the *Sandin* hearing, believed that the toxic effects normally associated with prolonged solitary confinement in SHU were enhanced in McClary's situation because, unlike inmates sent to SHU for punitive purposes, McClary's confinement was unrelated to any affirmative prison misbehavior and was potentially limitless in duration. *Id.* at 701–02, 756–57. The details of Grassian's trial testimony regarding the psychological and physiological effects of spending over four years in solitary confinement need not be repeated in detail here, but his trial testimony was consistent with the testimony he gave in the earlier *Sandin* hearing. *McClary v. Kelly*, 4 F.Supp.2d at 205–07.

After two weeks of trial, the case was submitted to the jury on the morning of February 22, 1999. The jury deliberated until 8:30 p.m. The following day, the jury returned a verdict finding defendants Hall, Branning, Irvin and Coughlin liable for their personal involvement in the continued administrative segregation of McClary at Attica and Wende. After making a determination as to liability, the jury heard summations of counsel and instructions from the Court on the issue of damages. That evening, the jury returned its verdict as to damages, finding defendant Hall liable in the amount of $10,000 for his role in denying McClary procedural due process at Attica and finding defendants Branning, Irvin and Coughlin liable in the amount of $650,000 for their roles in denying McClary procedural due process at

Wende.[6] On March 16, 1999, the liable defendants filed their post-trial motions.

### Discussion

In their motion papers, defendants raise six separate grounds for relief: (1) qualified immunity; (2) lack of personal involvement on the part of defendants Hall and Branning; (3) lack of connection between the denial of due process and plaintiff's placement in administrative segregation; (4) inconsistent verdicts as to defendants Hall and Kelly; (5) excessive damages; and (6) insufficient evidence. Each ground is separately discussed below.

■ 1. *Qualified Immunity:* The defense of qualified immunity "shields government officials from liability for damages on account of their performance of discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kim v. Hurston,* 182 F.3d 113, 120 (2d Cir.1999), *quoting Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, the defendants herein would be entitled to immunity from damages if: (1) their conduct did not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe their acts did not violate those rights. *Martinez v. Simonetti,* 202 F.3d 625, 2000 WL 129188 at *7 (2d Cir. February 4, 2000).

■ Defendants agree, as they must, that several years before McClary was first placed in administrative segregation the Supreme Court clearly established that prison inmates could have limited due process rights in being placed and maintained in administrative segregation. *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Further, the defendants concede that the Court in *Hewitt* also clearly established that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate" and hence, the need to maintain the inmate in restricted housing must be subject to meaningful "periodic review" by prison officials. *Id.* at 477, 103 S.Ct. 864 n. 9. Instead, defendants confine their qualified immunity defense to the claim that "while *Hewitt* may have clearly established that an inmate in administrative segregation was entitled to meaningful review of his status," the defendants are nevertheless entitled to qualified immunity because "neither the United States Supreme Court nor the Court of Appeals for the Second Circuit has clearly defined what constitutes meaningful review." *See* Defendants' Memorandum of Law (Docket # 112) at pages 2–3. According to defense counsel, "the absence of such *definitional specificity* entitles the defendants to qualified immunity." Defendant's Supplemental Memorandum of Law (Docket # 124) at page 2 (emphasis supplied).

Given the factual context of McClary's due process claims, this Court does not find defendants' "definitional specificity" argument to be particularly persuasive. Defendants' theory, in sum and substance, is that absent a precise and exact definition of what a meaningful periodic review of administrative segregation entails, prison officials are immunized from any conduct they may engage in while conducting such reviews no matter how contrived or fraudulent or pretextual their conduct may

---

**6.** The special verdict sheet required the jury to distinguish defendants' liability for violating McClary's due process rights at his initial administrative segregation hearing from his due process rights during his continued confinement in administrative segregation. The defendants do not contend that the jury's determination that they were liable with respect to McClary's *continued* confinement in administrative segregation but not liable with respect to McClary's *initial* confinement in administrative segregation were inconsistent determinations. Indeed, the verdict is fully consistent with the evidence in that there was no proof at trial that any of the defendants interfered with McClary's initial due process hearing conducted by the hearing officers at Attica or Wende. None of the hearing officers were named as defendants in this action.

be determined by a jury to be. Put differently, defendants argue that until meaningful periodic review is precisely defined by the Supreme Court or the Second Circuit, defendants are, as a matter of law, immune from liability for *meaningless* periodic reviews.

This Court does not believe the law of qualified immunity requires the wearing of such blinders. Precise "definitional specificity" has never been the determinant for "clearly established" legal rules. To be sure, the operation of the "clearly established" standard "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). But the important inquiry is not simply whether "the very action in question has previously been held unlawful," but whether the unlawfulness of the actions would be readily apparent to reasonable prison officials. *Id.* at 640, 107 S.Ct. 3034. *See Alexander v. Perrill,* 916 F.2d 1392, 1397 (9th Cir.1990)("the law simply does not require that we find a prior case with the exact factual situation in order to hold that the official breached a clearly established duty").

This was not a case about the subtleties of procedural due process or the nuances of what constitutes "meaningful" review of administrative segregation determinations. McClary's theory at trial was, in essence, that once the Goord memorandum (Exhibit 1A) was issued, the due process rights he was afforded under DOCS regulations to challenge his initial or continued assignment to administrative segregation were meaningless, and simply used by the defendants as "a pretext for indefinite confinement" in SHU.[7] *See Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. 864. Moreover, the Court's charge to the jury on the law of procedural due process with respect to continued confinement in administrative segregation required the jury to address only fundamental tenets of due process, basic principles that were "clearly established" during the relevant time period. On the issue of procedural due process rights for continued confinement in administrative segregation, the jury was instructed as follows:

> Even if an inmate's initial assignment to administrative segregation is fair and comports with due process, the inmate has a continuing due process right in connection with prison officials' decisions to maintain the inmate in administrative segregation.

> Unlike disciplinary segregation where an inmate is assigned to SHU housing for a specific term, assignment to SHU for administrative segregation is indefinite.

> Thus, prison officials must engage in some sort of periodic review of confinement of inmates placed in administrative segregation.

> New York Department of Corrections Regulations require that these reviews

---

**7.** In summation, McClary's lawyer repeatedly argued to the jury that the Goord memorandum demonstrated the procedural due process McClary was afforded was a "pretext" and a "sham": "So everything that happened from that day on [September 30, 1989] was just pretext. It was kind of going through the motions." (Trial Transcript, Volume IV at page 1522); "Again, it was a sham. I'm going to keep using that word sham, sham. It's a pretext. It's a fraud. All this was bogus. They put him in ad seg at the beginning. They kept him in ad seg for the entire time he served in ad seg because their minds were already made up that he was a bad dude. Because—quote, unquote—he was a cop killer and this was punishment beyond his sentence. Twenty-five to life was not enough for them, was not enough." (Trial Transcript, Volume IV at pages 1534–35); "And then they continued to keep him confined in violation of law because everything that happened after that—as you go through the exhibits you'll see, rubber stamp, rubber stamp. I mean exhibit after exhibit just shows photocopies, photocopies, changed dates, sometimes it has places where no dates just say like two slash, sign it anyway. Just going through the motions. This guy is staying in ad seg, come hell or high water, we don't care. We don't care." (Trial Transcript, Volume IV at page 1552).

take place every seven days for the first two months the inmate is in administrative segregation and monthly thereafter. The regulations require the initial review to be made by the prison's three member Administrative Segregation Committee.

The Committee's recommendation must then be forwarded in writing to the prison's Superintendent for final determination.

*This periodic review does not require officials to hold another hearing nor is it necessarily required that prison officials permit the inmate to submit additional evidence or a written statement. The prison officials may already be aware of the reasons why continued administrative segregation is justified.*

*However, although the periodic review procedure need not be highly structured, like all due process it must be meaningful.*

*Due process is not satisfied where the periodic reviews are a sham or a fraud. Rather decisions to keep an inmate in administrative segregation must be based on some evidence as to the need for continued confinement in SHU.*

If you find by a preponderance of the evidence that the due process regulations were not followed in a meaningful manner by one or more of the defendants, then the second element of the 1983 Civil Rights violation has been established.

If, however, you find that the regulations were followed in a meaningful manner by the defendants, then the second element of a civil rights violation has not been established.

Remember, as with all the elements of a 1983 civil rights violation, the burden of proof is on the plaintiff, Mr. McClary.

Trial Transcript, Volume IV at pages 1574–76. (Italics added).

The italicized portion of the instructions set forth above defined the due process standard the jury was required to use in evaluating whether plaintiff had met his burden of proof. All of the instructed law was "clearly established" at the time the defendants considered whether to keep McClary in administrative segregation. During the time period at issue it was clearly established that: (1) the due process clause required segregation decisions made by prison officials had to be based on "some evidence," *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985); (2) that although a flexible concept, a fundamental requirement of all due process is that it be "meaningful" and not a sham or a fraud, *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); and (3) in the context of decisions to maintain an inmate in administrative segregation, although prison officials need not hold another hearing or necessarily allow the inmate to submit additional evidence, informal, but non-pretextual periodic reviews must occur. *Hewitt v. Helms,* 459 U.S. at 477 n. 9, 103 S.Ct. 864. *See also Mims v. Shapp,* 744 F.2d 946, 951 (3rd Cir.1984) (holding that *Hewitt* instructed "what process is due during the periodic reviews that determine whether the confinement [in administrative segregation] should be continued").

The jury's verdict pays tribute to their factual finding that the liable defendants failed to meet the fundamental due process standard contained in the Court's charge. "Although the [defendants] testified that they engaged in periodic review, the jury was entitled to disbelieve them." *Deane v. Dunbar,* 777 F.2d 871, 877 (2d Cir.1985) (defendants protected by qualified immunity because "the right to periodic review of confinement in administrative segregation was not established as a component of due process until *Hewitt v. Helms,* which was decided more than ten years after the conduct at issue"). Based on the jury's factual finding here, this Court has no hesitancy in concluding that (1) the defendants' conduct violated clearly established constitutional rights, and (2) it was not objectively reasonable for the defendants

to believe that their acts did not violate those established rights. *See Mackey v. Dyke,* 29 F.3d 1086, 1094–95 (6th Cir.1994), *cert. denied,* 522 U.S. 848, 118 S.Ct. 136, 139 L.Ed.2d 84 (1997) (defendants *not* entitled to qualified immunity because inmate's right not to be confined arbitrarily in administrative segregation after reason for initial confinement no longer existed has been "clearly established" at least since *Hewitt v. Helms* ); *Sourbeer v. Robinson,* 791 F.2d 1094, 1101–04 (3rd Cir. 1986), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987) (rejecting qualified immunity defense and finding due process violation when purported justifications for continuing inmates' administrative segregation confinement examined in perfunctory manner). *See also Lowe v. Carter,* 554 F.Supp. 831, 836–37 (E.D.Mich.1982) (pre-*Hewitt* case rejecting qualified immunity defense where inmate claimed defendants ignored his right to monthly reviews of administrative segregation status). For these reasons, defendants' post-trial motion seeking qualified immunity for their actions as a matter of law must be **denied.**

[4] 2. *Personal Involvement of Defendants Hall and Branning:* Defendants Hall and Branning move for judgment as a matter of law because their involvement in keeping McClary in administrative segregation was "limited" to being members of the Administrative Segregation Review Committee. Hall and Branning argue that because the final determination as to whether an inmate is continued in administrative segregation is made by the prison superintendent, as ASRC members, they lacked the requisite "personal involvement" to impose liability under 42 U.S.C. § 1983.

[5] It is beyond dispute that as a prerequisite to maintaining a section 1983 action for damages against a defendant in his individual capacity, a plaintiff must establish the defendant's direct or personal involvement in the alleged constitutional deprivation. *Williams v. Smith,* 781 F.2d

319, 323 (2d Cir.1986). Under the facts adduced at trial, this Court finds that Hall and Branning's participation as members of the ASRC gave them sufficient personal involvement in the alleged due process violation to expose them to liability.

The ASRC is not an ad hoc or informal gathering of prison officials. The ASRC was created pursuant to formal regulations promulgated by DOCS and its membership is specifically defined in the regulations. *See* 7 N.Y.C.R.R. § 303.4. The regulations vest the ASRC with primary responsibility for reviewing administrative segregation status of inmates at specified intervals and then forwarding the results of the required review, in writing, to the prison superintendent. *Id.* at § 301.4(d). Hall and Branning were the Chairmen of the ASRC committees at Attica and Wende. Both signed and submitted the ASRC status review reports to their superintendent. In each and every report, Hall and Branning recommended that McClary remain in administrative segregation.

Personal involvement does not hinge on who has the ultimate authority for constitutionally offensive decisions. Rather, the proper focus is the defendant's direct participation in, and connection to, the constitutional deprivation. "The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Conner v. Reinhard,* 847 F.2d 384, 397 (7th Cir.), *cert. denied,* 488 U.S. 856, 109 S.Ct. 147, 102 L.Ed.2d 118 (1988). Here, there was ample proof for the jury to find that the prison superintendents considered and relied on the recommendations of their ASRC. *See Wulf v. City of Wichita,* 883 F.2d 842, 864 (10th Cir.1989) (sufficient personal involvement found in § 1983 action where defendant did not have ultimate authority, but his recommendation ultimately led to unconstitutional action by another).

As members of the ASRC, defendants Hall and Branning were integral parts of the decision making process which the jury ultimately found to be unconstitutional. For this reason, their motions to dismiss the judgments against them for lack of personal involvement must be denied.[8]

3. *Justifiable Liberty Deprivation:* Relying on *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) and *Patterson v. Coughlin,* 905 F.2d 564 (2d Cir.1990), defendants argue that even assuming *arguendo* that they violated McClary's procedural due process rights by denying him meaningful review of his administrative segregation status, McClary is only entitled to nominal damages because "plaintiff would unquestionably have remained in such segregation had a meaningful review of his circumstances been conducted." Defendants' Memorandum of Law (Docket # 112) at page 10.

*Carey* and *Patterson* stand for the proposition that a jury finding of liability against a defendant for a violation of a plaintiff's constitutional right to procedural due process requires an award of nominal damages in an amount not to exceed one dollar. "Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed (citations omitted), we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Carey v. Piphus,* 435 U.S. at 267, 98 S.Ct. 1042. *See also Gibeau v. Nellis,* 18 F.3d 107, 110–111 (2d Cir.1994) (a plaintiff in a § 1983 action must be awarded nominal damages upon proof of a violation of a constitutional right). The requirement of awarding nominal damages without actual injury has been held to apply to the limited procedural due process protections afford-ed prison inmates. *See Patterson v. Coughlin,* 905 F.2d at 568 ("It is clear that where there has been a denial of due process, the victim is entitled at least to nominal damages").

In addition, the *Carey* and *Patterson* decisions also dealt with "justifiable" liber-· ty deprivations. That is, if a jury finds that a defendant denied an inmate procedural due process, but that despite the improper procedure, plaintiff's confinement in administrative segregation was nonetheless justified, the jury may *not* award damages resulting from the liberty deprivation. "[I]njury caused by a *justified deprivation,* including distress, is not properly compensable under § 1983." *Carey v. Piphus,* 435 U.S. at 263, 98 S.Ct. 1042. (emphasis supplied). *See Patterson v. Coughlin,* 905 F.2d at 568. ("*Carey* also made it clear that even where a denial of due process has been followed by a liberty deprivation, *unless the deprivation was caused by the violation* the plaintiff is limited to nominal damages") (emphasis supplied). Notwithstanding the foregoing, *Carey v. Piphus* also made clear that even where the procedure causing the liberty deprivation was flawed but the resulting deprivation was nonetheless justified, a plaintiff may properly seek damages for "mental and emotional distress *actually [ ] caused by the denial of procedural due process itself.*" 435 U.S. at 263, 98 S.Ct. 1042 (emphasis supplied).

Defense counsel requested that the Court include in its instructions the "justifiable deprivation" holdings of *Carey* and *Patterson. See* Transcript of Charge Conference (Docket # 125) at page 22. The Court granted the defendants' request to charge. Trial Transcript, Volume IV at page 1444. After a lengthy discussion, defense counsel ultimately objected to that portion of the damage charge which instructed the jury that it could award compensatory damages actually caused by the

---

**8.** This Court acknowledges that it's holding amounts to respectful disagreement with Chief Judge Larimer's contrary view as ex-pressed in *Edmonson v. Coughlin,* 21 F.Supp.2d 242 (W.D.N.Y.1998).

denial of due process itself. *Id.* at 1635–54. Thereafter, the Court instructed the jury on the law of damages, including the holdings of *Carey* and *Patterson. Id.* at 1703–06. Relying on the Court's charge, defense counsel repeatedly argued to the jury in his summation that even if McClary had been given meaningful due process, he still would have been maintained in administrative segregation. *Id.* at 1663, 1664, 1666, 1670, 1671, 1673.

In their post-trial motions, the defendants simply argue, as they did in summation, that assuming a denial of procedural due process, McClary's confinement in administrative segregation was nevertheless justified. The jury, after weighing the evidence and evaluating the credibility of the witnesses, disagreed with the defendants' view of the proof. Given the restrictive standards for granting judgment as a matter of law or a new trial, this Court has not been presented with adequate grounds to grant either form of relief. Accordingly, defendants' motions to limit the judgment to nominal damages must be **denied.**

■ 4. *Inconsistent Verdicts:* Defendant Hall argues that the verdict of liability against him is inconsistent with the verdict in favor of defendant Kelly. The Second Circuit recently instructed:

> When confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case, if there is one, that resolves any seeming inconsistency. Before a court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt to reconcile the jury's findings, by exegesis if necessary.

*Turley v. Police Department of City of New York,* 167 F.3d 757, 760 (2d Cir.1999) (internal quotations and citations omitted).

Given the foregoing standard, Hall's motion must be denied because he has failed to demonstrate how his verdict is even "potentially inconsistent" with Kelly's ver-

dict. Kelly's liability in the case was tenuous from the start as he was on medical leave for much of the time that McClary was confined in administrative segregation at Attica. Kelly testified that he was on leave beginning November 11, 1989 and did not fully resume his duties until April 16, 1990. During that period, Kelly testified that he "had nothing to do with the operation of the facility." Trial Transcript, Volume III at page 1285. Indeed, Kelly testified that it was not until April or May, 1990 that he even knew that David McClary was confined at Attica. Trial Transcript, Volume I at page 418. While he was on leave, Charles Brunelle,[9] as Deputy Superintendent for Security, was responsible for reviewing the recommendations of the ASRC. Trial Transcript, Volume III at page 1277. While there was a period of time that Kelly testified that he was reviewing the ASRC reports, it was relatively brief, as in July 1990, McClary was transferred to the Southport Correctional Facility. By contrast, during the entire time McClary was housed in SHU at Attica, defendant Hall served as chairman of the ASRC committee and signed each of the ASRC recommendation forms. During closing argument, Kelly's attorney (who also served as Hall's attorney) argued to the jury that "Walter Kelly wasn't at the facility during most of the time that Mr. McClary was at ad seg." Trial Transcript, Volume IV at page 1488.

In light of the differences in both the degree and the scope of their involvement with McClary's confinement in administrative segregation at Attica, the verdict of liability against defendant Hall is not irreconcilably inconsistent with the verdict in favor of defendant Kelly. Accordingly, Hall's motion to set aside the verdict must be **denied.**

■ 5. *Excessiveness of the Verdict:* This Court has the authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of

---

**9.** Brunelle was not a defendant in the case.

an excessive verdict and a new trial, in two situations: (1) "where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" and (2) "more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998) (internal quotations and citations omitted). Where, as here, the defendants' point to no particular discernable trial error, the Second Circuit has instructed that the "jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice." *Id.* (internal citations and quotations omitted). In evaluating excessiveness, "[r]eference to other awards in similar cases is proper." *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990).

 Evaluating excessiveness in the context of an individual spending four, uninterrupted years in SHU solitary confinement is no easy task. McClary himself testified to the conditions of SHU confinement and the resulting devastation such isolation had on his mental and physical health. Unlike inmates sentenced to SHU as punishment for prison misbehavior, McClary's term in SHU was potentially limitless, a fact that exacerbated the damages he suffered. The expert testimony of Dr. Stuart Grassian as to the damage caused by years of isolation in a toxic environment such as SHU was compelling and certainly supported a substantial verdict.

Nevertheless, this Court is convinced that the jury's verdict on damages was excessive. In reaching this determination, the Court takes into account several factors. First, the amount of damages the jury awarded exceeded by a substantial margin damages awarded in other cases involving improper (albeit less lengthy) placement in SHU. *See, e.g., Lowrance v.*

*Coughlin,* 862 F.Supp. 1090, 1120 (S.D.N.Y.1994) ($100 per day damages for unlawful segregated confinement); *Nolley v. County of Erie*, 802 F.Supp. 898, 908 (W.D.N.Y.1992) ($125 per day damages for unlawful segregated confinement). Second, in his supplemental complaint, filed on March 12, 1997, (after McClary had been released from SHU) McClary sought damages "in the amount of one hundred fifty dollars ($150.00) per day for each day of his confinement in SHU." *See* Supplemental Complaint (Docket # 70). Finally, at the Court's final pretrial conference held just days before the commencement of the trial, plaintiff was required to submit an itemization of damages claimed. In his pretrial statement, McClary sought a total of $237,500 dollars, representing $125 dollars per day "due to illegal confinement in SHU" and $50,000 dollars attributable to "mental and emotional distress."

After the jury found for plaintiff on the issue of liability, counsel gave supplementary closing arguments and the Court gave supplemental instructions as to damages. The jury was not asked by defense counsel, plaintiff's counsel or the Court to measure plaintiff's damages on a per diem basis. Nevertheless, the $660,000 verdict translates into a per diem equivalent of almost $500 per day. Given the range of damages previously awarded to inmates who suffered unlawful SHU confinement cases, and after considering the amount of damages itemized and sought by McClary just prior to trial, the damages awarded by the jury appear to this Court to be excessive.

Upon a finding that a verdict is excessive, the Court "may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir.1995). While the jury's award was excessive, there is nothing to suggest that their finding of liability was insupportable or that it

was infected by passion, prejudice or other error. Accordingly, the Court finds that the remedy of remittitur is proper and fair in this case. For these reasons, the Court will deny defendants' motions for a new trial conditioned upon plaintiff's consent to a remittitur and damages in the amount of $237,500.[10]

 6. *Verdict Against the Weight of The Evidence:* At the close of the plaintiff's case, defendants' made a motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure. Trial Transcript, Volume III at page 1055. Defense counsel articulated three specific bases for Rule 50 relief: (1) Eleventh Amendment (*Id.* at 1057); (2) lack of personal involvement (*Id.* at 1058); and (3) qualified immunity (*Id.* at 1063). Extended argument was heard by the Court, particularly as to the issues pertaining to lack of personal involvement and qualified immunity. (*Id.* at 1063–1087). However, absent from the defendants' Rule 50 motion was any claim regarding the sufficiency of the evidence. The Second Circuit has instructed on the consequences of failing to particularize the grounds for a Rule 50 motion:

> A Rule 50(a) motion "shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.P. 50(a)(2). It must be made "before the submission of the case to the jury," id., and, if rejected, may be renewed after the jury verdict.
>
> Rule 50(b) governs the procedure for renewing such a motion for judgment as a matter of law. A Rule 50(b) motion can be made after the jury verdict, but only if a Rule 50(a) motion was made prior to the close of the evidence. Together, Rules 50(a) and (b) "limit the grounds for judgment n.o.v. to those specifically raised in the prior motion for a directed verdict." *Lambert v. Genesee*

*Hosp.,* 10 F.3d 46, 54 (2d Cir.1993) (*quoting Samuels v. Air Transp. Local 504,* 992 F.2d 12, 14 (2d Cir.1993)), *cert. denied,* 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994). *See also* Fed. R.Civ.P. 50(b), Notes of Advisory Committee to 1991 Amendment ("A posttrial motion for judgment can be granted only on grounds advanced in the preverdict motion.").

We have previously stated that "the specificity requirement is obligatory" and that its purpose is to "ensure[ ] that the other party is made aware of any deficiencies in proof that may have been overlooked." *Lambert,* 10 F.3d at 54 (*citing* Fed.R.Civ.P. 50(b), Notes of Advisory Committee to 1991 Amendment). Requiring a party to state specific grounds for its Rule 50(a) motion "put[s] a party on notice of potential deficiencies in its proof before the case is submitted to the jury." *Id.*

*Holmes v. United States,* 85 F.3d 956, 961–62 (2d Cir.1996). Where, as here, the defendants have not included sufficiency of the evidence as a ground for their initial motion for judgment as a matter of law, this Court may not consider the omitted ground in any post-trial motion pursuant to Rule 50(b). *Gierlinger v. Gleason,* 160 F.3d 858, 869–70 (2d Cir.1998) (court lacks authority to grant judgment as a matter of law on insufficiency grounds where defense counsel fails to specify sufficiency of the evidence as basis for JMOL motion); *Hilord Chemical Corp. v. Ricoh Elecs., Inc.,* 875 F.2d 32, 38–39 (2d Cir.1989) ("In any event, the motion for j.n.o.v. cannot assert a ground that was not included in the motion for a directed verdict").

Waiver of the Rule 50 procedural requirement can only be granted to "prevent manifest injustice." *Cruz v. Local Union No. 3,* 34 F.3d 1148, 1155 (2d Cir.1994). Defendants here do not argue that manifest injustice occurred. Instead, they ar-

---

**10.** Damages in the amount of $237,500 are the per diem equivalent of awarding approximately $175 per day for each day the jury found McClary to have been unconstitutionally confined in SHU.

gue only that they have met the standard necessary to obtain judgment as a matter of law. Such arguments are insufficient to justify the granting of an otherwise untimely motion.

It is not without significance to this Court that the very first time the defendants raised a sufficiency of the evidence argument was in their supplemental memorandum of law filed on October 12, 1999, (Docket # 124), more than seven months after the judgment in the case was filed. The portion of the supplemental memorandum of law that pertains to the sufficiency of the evidence conspicuously argues only the standard applicable to Rule 50 motions and not the less stringent standard applicable to Rule 59 motions for a new trial. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970 (2d Cir.1987) ("a less stringent standard applies to a motion for a new trial"). Given that defendants' arguments regarding the sufficiency of the evidence were: (1) not raised in their Rule 50(a) motion; (2) not raised in papers filed in support of their Rule 50(b) motion until seven months after the judgment was filed; and (3) when finally raised, were mentioned only with respect to seeking judgment as a matter of law, this Court has serious doubts whether it could properly consider defendants' sufficiency of the evidence arguments under the Rule 59 standard. *Arkwright Mutual Insurance Co. v. Philadelphia Elec. Co.,* 427 F.2d 1273, 1275 (3rd Cir.1970); *Conrad v. Graf Bros., Inc.,* 412 F.2d 135, 137 (1st Cir.), *cert. denied,* 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969). *See generally* Annotation, *Amendment, After Expiration of Time for Filing Motion for a New Trial in Civil Case, of Motion Made in Due Time,* 69 A.L.R.3d 845 (1976).

■ While this Court does have the authority under Rule 59(d) to *sua sponte* grant a new trial "if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice," a trial judge may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *United States v. Landau,* 155 F.3d 93, 104 (2d Cir.1998) (internal quotation and citation omitted). Perhaps more than most others, this trial required the jury to make difficult, but nonetheless unavoidable, credibility determinations. Their verdict pays tribute to who they believed and who they did not. Their credibility determinations are entitled to deference and, in the absence of a miscarriage of justice, will not be lightly tossed aside. Indeed, the Second Circuit has advised that "[w]here the resolution of the issues depended on the assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and ordering a new trial." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

■ There is no doubt in this Court's mind that the jury in this case paid close attention to the evidence, the arguments of counsel and the instructions of the law and that their verdict, while subject to criticism, was fairly based on the evidence adduced at trial. That being the case, this Court has no basis to and will not *sua sponte* grant defendants a new trial.

### Conclusion

For the reasons set forth in this Decision and Order, defendants' motions for judgment as a matter of law are **denied**. Defendants' motions for a new trial are **granted in part** as this Court orders a remittitur with respect to plaintiff's claims against the liable defendants reducing the judgment to $237,500 dollars. Should plaintiff fail to file a written consent to such remittitur with the Clerk of the Court within ten (10) days from the filing of this Order, then defendants are granted a new trial on the issue of damages only. All other aspects of defendants' motions for a

new trial are **denied.**[11]

**SO ORDERED.**

---

**11.** The Court is aware that the standard for relief under Rule 59 is "less stringent" than the standard to be applied in determining a JMOL motion. *See Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir. 1987). After measuring the defendants' alternative motion for a new trial under the less stringent Rule 59 standard, the Court finds that defendants are not entitled to relief, except with respect to that portion of their motion which concerns the excessiveness of the jury's verdict, as set forth in this Decision and Order.